Dickman, Appellee, *v.* Struble et al., Appellants.[*]

---

[*]Motion to certify the record overruled, October 9, 1957.

(No. 1064—Decided May 16, 1957.)

*Messrs. Henkel, Ross, Sauter & Lett* and *Mr. Edward H. Jones,* for appellee.

*Mr. H. L. Dowler,* for appellants.

YOUNGER, J. This is an appeal in an action for damages for personal injuries sustained by plaintiff, appellee herein, and arises from a collision between a truck operated by plaintiff and a tractor-trailer outfit operated by an agent and employee of defendant, appellant herein, on U. S. Highway No. 30S approximately three-tenths of a mile west of the Marion-Morrow county line in Marion County on July 20, 1953. At the point of collision U. S. Highway No. 30S runs east and west, is macadam, white center-lined, and a little over 19 feet in width. It rises gradually to the west and a short distance west of the point of collision curves to the south gradually with an external angle of 15° 21½'. The collision occurred about 11:15 p. m. and the pavement was dry.

The petition alleges that the defendant's employee was operating the tractor-trailer outfit approximately three feet to his left of the center line, while the answer, claiming contributory negligence, alleges that the plaintiff was driving on, over and across the white center line.

Thus, the main and fundamental issue to be first determined by the jury was: Where did the collision occur? Or, was the point of impact north or south of the painted center line? This would settle definitely and finally the claim of negligence against defendant's operator or the contributory negligence of the plaintiff.

The plaintiff was alone in his truck, and the defendant's tractor-trailer outfit was being followed by a Chevrolet whose driver was also unaccompanied. The defendant's employee was accompanied by his wife, since divorced and now living in California.

This appeal is from the final order of the Common Pleas Court entering judgment in favor of plaintiff in the sum of $15,000 in accordance with the verdict of the jury.

At the trial of this cause the plaintiff called as his witness the operator of defendant's tractor-trailer outfit, and read into evidence the deposition of the operator's former wife, taken by the defendant in California, and also introduced in evidence 35 photographs taken within an hour after the collision showing the various vehicles, the pavement of the highway, the guard rails along the south side of the highway, and other pertinent physical facts, together with a surveyor's plat, Exhibit 36, showing the highway, its curve, the location of posts and guard rails on the south side of the highway, directions, angles, etc.

The plaintiff testified that as he rounded the curve he saw the headlights of an approaching vehicle, but was blinded by them and could not say where his truck was with reference to the painted white center line at the time of the collision. The testimony of the defendant's operator, his former wife, and the driver of the Chevrolet following the tractor-trailer outfit was all definitely to the effect that the defendant's operator was on his own right side of the highway.

At the trial of the cause, plaintiff produced an expert witness who had studied the 35 photographs and surveyor's plat introduced in evidence and had visted the scene of the collision. As to his qualifications, he testified that he was a graduate of the Harvard Engineering School in mechanical engineering and business administration; that he graduated in 1932 and during the year 1936 had completed a course at the Harvard Bureau for Street Traffic; that during a four-year period he was street supervising engineer for the Liberty Mutual Insurance Company, supervising a national accident prevention service for the fleet of commercial vehicle policy holders of that company, developing a maintenance service involving brakes, windshield wipers, tires, lights, etc.; that from 1941 through 1945 he was the Boston district engineer for the insurance company, supervising all forms of accident prevention service in the Boston, Massachusetts, area; that from 1945 through 1947, while still with the Liberty Mutual Insurance Company, he was director

of its traffic safety bureau on a national scale, which included the direction of traffic surveys and development of accident prevention literature, making complete studies of accidents by types and location; that from December 1, 1947, he continued to Cleveland where he established and served as an engineering and traffic director of the transportation department of the Cleveland Automobile Club, which involved the safety service of the Automobile Club and "all city traffic engineering service"; that for three years he was in similar traffic engineering as administrative assistant to The Cleveland Planning Commission, which is a county operation; that he had studied the factual inferences that may be drawn from skid marks, tire marks, gouge mark, and damages as they appear upon automobiles that had been involved in accidents; that he was a former instructor in an evening course in connection with those things at Fenn College, Cleveland; that he was a registered engineer in the state of Ohio, No. 17041, in mechanical engineering, and as such had to know the relationships of body, momentum, applied force, etc., as to whether they have a direct relationship before and after impact; that he was familiar with the operation of air brakes upon commercial trucks; and that it is the law in this state that commercial vehicles are so designed that if a tractor and semi-trailer become separated the brakes upon the trailer shall take hold.

He was asked to assume that a tractor-trailer outfit of the same model, weight, measurements, and equipment as the parties had stipulated defendant's outfit to be was traveling at 40 to 45 miles per hour and by reason of a collision the air connections became broken or destroyed, and whether in his opinion the brakes on the trailer would come into operation. His answer was that they would. He was asked to assume they had come into operation and had locked, and his opinion as to whether the tires would make skid marks on the pavement on which they were traveling. He stated that they would, especially since the trailer was empty.

He was then asked a hypothetical question which assumed all the physical facts concerning the two vehicles involved, including models, weights, measurements as to length, breadth and heighth, number and size of wheels, tires and axles, and which concluded as follows:

"* * * assume further, Mr. Billings, that these two vehicles collided * * * some portion of the Dodge truck and the tandem or drive wheels upon the 1951 International truck; that in such collision the air supply to the brakes was broken, and that the brakes upon the rear tandem of the trailer locked; assuming those facts, Mr. Billings, do you have an opinion, based upon your experience, your studies, your knowledge of brakes, and reasonable probabilities, as to where, insofar as the easterly and westerly direction is concerned, the point of first impact occurred between those vehicles?"

Over objection, which was overruled, his answer was as follows:

"My opinion, based upon the information you have given me here verbally, and the photographs in front of me, occur at a point placing the west bound tractor trailer unit in such a position that its rear tandem wheels were one hundred twelve feet east of the westerly most post of the guard rail which continues around the curve on the south side."

He was asked to and did put an "X" mark on the surveyor's plat, Exhibit 36, at the point at which in his opinion the first impact occurred.

When asked his reasons for such opinion, he stated:

"I drew my conclusions from two illustrations here, based on the facts you have given me. One illustration is plaintiff's Exhibit 3 * * * photograph, and Exhibit 36. * * * I have those illustrations, I have the location of my skid marks."

He was then asked:

"Now, based upon those facts, your experience, your knowledge of physics, and reasonable probabilities, do you have an opinion as to the position of the 1951 International tractor and the Gramm trailer, in relationship to the center line?"

His answer, after objection thereto had been overruled, was as follows:

"My opinion—I think you gave me two questions there. My opinion, first of all, goes to the rear tandem of the trailer, and it is this: The outside rear tandem is a distance of five feet six inches to the right of the center line and the outside rear tandem on the left side. I am doing a little figuring; I will

give that to you immediately—and the outside of the rear tandem is from the outside rear tandem on the left side is twenty-nine inches, or two feet and five inches to the left of the center of the center line.''

When asked the reasons for such opinion, he stated:

''First of all, I arrived at my first conclusion relative to the rear tandem of the trailer on the basis of plaintiff's Exhibit Number 3, knowing that the,—that the width of the lane at the front of the skidmarks is nine and three-tenths wide, furthermore know that the distance, let us say, the outside width of the rear tandem wheels of the trailer is 95 inches, from the photograph I was able to deduct these proportions, the position of the skid marks, the position of the right rear tandem wheels, which fixes of course the left tandem wheels, since the outside dimension is 95 inches.''

It should be here pointed out that plaintiff's Exhibit 3 is a photograph showing the white painted center line of the pavement very distinctly, though the photograph was taken at night. To the left side of the pavement is a state highway patrol car, back of which the guard rails on the south side can be seen. To the right of the center line and in the foreground is shown the rear end of the defendant's tractor-trailer outfit which is about three-fourths off the highway on the berm to the right. In the center of the picture the white center line is blurred, evidently by skid marks which can be traced directly to the left rear wheels of the trailer, and to the right of the center line are two heavy skid marks which can be traced directly to the two right rear wheels of the trailer.

It was the testimony of defendant's operator, substantiated by his then wife, that immediately after the collision the operator had difficulty in controlling his driving, that his truck tended to veer to the left and that he came to a stop in the center of the highway, and after getting out and looking around, he dragged his outfit over to the north side of the pavement and to the berm so that it would be out of the way. This testimony was completely ignored in the hypothetical question put to the expert, and, on the contrary, it was assumed that the brakes of the trailer locked at the moment of impact. That was the basis of the answer of the expert, as he assumed that the im-

pact occurred where these skid marks start. From the photograph he estimated the north skid mark to be 66 inches to the right of the center line. Since he knew that the width at the rear tires was 95 inches, he substracted 66 from 95 which gave him an answer of 29. Therefore, he testified, in effect, that since the right rear tandem wheels fix the course of the left rear tandem wheels, and since the right rear tandem wheels were 66 inches to the right of the center line, the left rear tandem wheels were 29 inches to the left of the center line, and that, therefore, in his opinion the point of first impact was 29 inches to the left of the center line, thereby establishing negligence on the part of the defendant's operator. However, had the hypothetical question contained all the evidence before the jury, we would still have to hold that the admission of the opinion in evidence was prejudicial error because it was an opinion upon the ultimate fact in issue before the jury and not the interpretation of a scientific fact which was beyond the experience, knowledge and comprehension of the jury.

The applicable rule and the exception are stated in 21 Ohio Jurisprudence (2d), 422 and 423, Sections 414 and 415, as follows:

"In many cases it is asserted as a broad general rule, often assumed to be an inflexible rule of law, that while an expert may be permitted to express his opinion, or even his belief, he cannot give his opinion upon the precise or ultimate fact in issue before the jury, which must be determined by them.

"The general rule that a witness may not give his opinion upon the precise or ultimate fact in issue to be determined by the jury, applicable both to nonexperts and experts, is subject to a well-recognized exception in the case of expert witnesses. Thus, where an ultimate fact to be determined by the jury is one depending upon the interpretation of certain scientific facts which are beyond the experience, knowledge, or comprehension of a jury, a witness qualified to speak as an expert on the subject matter may express an opinion as to the probability or actuality of a fact pertinent to an issue in the case, and the admission of such opinion in evidence does not constitute an invasion or usurpation of the province or function of the jury, even though the opinion is on the ultimate fact which the jury

must determine. This exception is particularly applicable as to the cause of a particular occurrence or accident, where the subject matter is not one of common observation or knowledge, and requires expert testimony to establish the ultimate fact.''

The Supreme Court of Ohio, in *Shepherd* v. *Midland Mutl. Life Ins. Co.*, 152 Ohio St., 6, 87 N. E. (2d), 156, states the rule and the exception as follows on page 11:

''The usual reason given for this rule is that the admission of such evidence constitutes an invasion of the province of the jury. Hence, it has been held by the courts that opinion evidence was inadmissible to support the following propositions: That a transaction was bona fide; that a person acted carefully in a specific situation; that no more force was used in the ejection of a passenger from a train than was necessary; that a person exerted a controlling influence over a testator; that a fire could not have been started from a spark emitted from a smokestack; that a place of employment was an unsafe place to work; that if a machine had been covered with a guard, a person would not have been injured; and that there was no fraud in the procurement of a signature on a note.

''But this rule is subject to a well recognized exception applicable in a case where the ultimate issue to be determined by a jury is one depending upon the interpretation of certain scientific facts beyond the experience, knowledge or comprehension of the jury, in which event a witness qualified to speak as to the subject matter involved may express an opinion as to the probability or actuality of a fact pertinent to such issue, and the admission of such opinion in evidence will not constitute an invasion or usurpation of the province of the jury. * * *

''The reason for the admission of expert opinion in such cases, especially as it relates to the cause of injury or death, is that the determination of the issue often depends upon the application of a knowledge of anatomy or organic functions or an experience in a field not possessed by the average juror. Where the opinion of an expert is so admitted upon the ground that it concerns a matter of skill or science, there is in fact no invasion of the province of the jury because the jury itself is not supposed to be competent to deal with such matters without the aid of such opinion.''

We are fully aware that the calling of expert testimony and the extent to which such testimony and opinion evidence may be received rest largely in the discretion of the trial court, and that unless the evidence so admitted appears to have been prejudicial the verdict should not be set aside. However, we are convinced in this case that the admission of the opinion of the expert as to the place of impact of the two vehicles was prejudicial for two reasons.

In the first place, the list of the expert's qualifications and experience was impressive, and his opinion without doubt caused the jury to reject, in its entirety, the testimony of the only three people in the world who had any knowledge of the facts as to where the impact occurred, or who were in a position and physically capable of seeing and knowing such facts. Except for this opinion, the plaintiff in all probability would have been nonsuited when he rested his case. Moreover, the qualifications and previous experience of the expert showed no great experience, if any at all, in the interpretation of photographs.

In the second place, the place of impact of two vehicles is a matter within the experience, knowledge and comprehension of an average layman or juror. It is not a matter involving an interpretation of scientific or technical knowledge, with which the jury itself is not supposed to be competent to deal. It is true a plaintiff or a defendant may not always be able to prove his theory as to how the accident occurred, from the living witnesses, from the skid marks, from the physical damage done to the vehicles, from the position on the highway of the debris, oil, dust and mud from the underside of the automobiles generally left after a collision, or from the photographs of many of these things. It could be he adopted a wrong theory to support his side of the case. To permit opinion evidence upon such a simple question, even though the facts to be given consideration might be complicated, is to open wide the door of speculation by the jury, and to the return of verdicts based upon illegitimate considerations.

We find no other prejudicial error set forth in the assignments of error or argued in the briefs.

Having found that prejudicial error intervened in the ad-

mission of the testimony heretofore discussed, the judgment of the Common Pleas Court will be reversed and the cause remanded for a new trial.

*Judgment reversed.*

MIDDLETON, P. J., and GUERNSEY, J., concur.