BRAHAM, APPELLANT, *v.* LOUTTIT, APPELLEE.

[Cite as Braham v. Louttit, 1 Ohio App. 2d 393.]

(No. 3076—Decided July 31, 1964.)

*Messrs. Smart & Smart,* for appellant.
*Messrs. Carson, Vogelgesang & Sheehan,* for appellee.

McLaughlin, J. This appeal on questions of law is from a defendant's verdict in an automobile negligence case. Trial court designations are used.

Plaintiff sued to recover for personal injuries received in a head-on collision. She was a passenger in a car driven by her husband. They were from West Virginia, in a Studebaker, travelling northerly; and the defendant, a local resident, was travelling in a Plymouth southerly on South Market Avenue in Canton. Their cars met on a curve intersected by Kimball Road which leads off southwesterly from South Market.

Defendant was following a bus which stopped on the curve to discharge passengers. He swung his car out and passed the bus on its left side. The head-on collision took place about one car length ahead of the bus.

The jury verdict favored defendant. It answered a special interrogatory that the accident took place on defendant's half of the street.

During the five-day trial there was much bickering between counsel and between the court and counsel. Charges of misconduct were hurled both ways and at the trial court. We find no prejudicial error with respect thereto.

Assignments of error Nos. 1, 2, 3, 4, 5, 6, 8 and 10 are overruled. We attention assignments of error Nos. 7 and 9.

VII. "That the verdict and judgment are contrary to law." Included by proper inference is the claimed error that the verdict and judgment are contrary to the manifest weight of the evidence.

IX. "Trial court committed prejudicial error in overruling the plaintiff's motion for judgment notwithstanding the verdict."

Plaintiff was a passenger, and her husband-driver's contributory negligence, if any, could not be imputed to her. However, the defendant by answer asserted that the husband was operating his car to the left of center on South Market when the accident occurred and that such was the sole cause of the accident.

The evidentiary questions pointedly became: Where was the point of impact with relation to the hypothetical center line,

and on whose side of the center line did this collision occur?

Plaintiff's testimony and that of her husband-driver was naturally to the effect that the defendant in passing the bus on the curve came over onto their lane of traffic. Also the husband testified as follows:

"Q. After the two collided, what happened, if anything? A. Well, I was seated in the car and took hold of my wife. This man—I didn't know his name at that time—came down and asked me, was anyone hurt. I said, 'yes, my wife.' He said, *'I'm sorry. I didn't see you people coming. I was in a hurry to get to a ball game.'* He said not to worry, 'I will take care of all expenses.' " (Emphasis added.)

Also, the plaintiff, herself, testified as follows:

"Q. Following the collision, did you have a conversation with Mr. Louttit? A. No, sir.

"Q. In your presence did Mr. Louttit have a conversation with Mr. Braham? A. Yes, sir.

"Q. Do you recall that conversation? A. Yes, he came to the car.

"Q. Will you tell the court and jury where that conversation took place at? A. At the side of the Studebaker.

"Q. Will you tell the court and jury what Mr. Louttit said?

"Mr. Banas: Object.

"The Court: Overruled.

"A. Mr. Louttit said, *'I am sorry. I was in a hurry to get to a basketball game. I didn't see you folks coming.'* " (Emphasis added.)

The plaintiff called the bus driver, Lehman Watson, an eye witness, the accident having happened in front of his stopped bus. He testified as follows:

"A. That curve is blind. It's a blind curve.

"Q. When you stopped the bus on February 26, 1959, if you can recall, about how close would the rear of the bus be to the right curb on Market Avenue? A. Within two feet.

"Q. In regard to the front end of the bus when you stopped, as you did on that night, tell the court and jury how the front end of your bus was—the position—what in relation to your right curb? A. It could have been three or four feet from the curb, the front end. The bus was setting parallel, more or less, like it is.

"Q. Where was the northbound car when you first saw it? A. You mean—it was coming around the curve on Market Avenue, South bearing north.

"Q. In relation to the right and left side of Market Avenue, *on what side of the street was the northbound car?* A. *To the right side.*" (Emphasis added.)

And on cross-examination, such witness testified as follows:

"Q. This impact took place at about the center of Market Avenue, South, that's correct is it not? A. *You* said about.

"Q. That's right. Did you understand my question? A. Yes, sir.

"Q. Would you answer? A. *I would say the southbound car was in the center of the highway or the street.*
"* * *

"Q. Can you tell this jury which half of the highway this impact took place on? A. Yes, sir." (Emphasis added.)

Plaintiff also called Michael Horton, another eye witness, a bus passenger who was sitting in the front seat of the bus, opposite the driver. He testified as follows:

"Q. Did you observe either car before they collided? A. Yes, sir.

"Q. Which car did you observe? A. *The Plymouth.*

"Q. Which direction was the Plymouth travelling? A. South.

"Q. What did you observe about the *Plymouth?* A. Well, *he was passing the bus* in an awkward position and he was coming at a pretty fair rate of speed for the curve, *and he was actually out of the southbound lane into the northbound lane of traffic.*
"* * *

"Q. Did you see the two automobiles coming together? A. Yes, sir.

"Q. In relation to the bus, where did they come together? A. Approximately eight feet in front of the bus.

"Q. On which side of the bus? A. The left side.

"Q. In which lane of travel? A. *It was the majority of the cars was* in the southbound lane—I mean *the northbound lane.*
"* * *

"Q. Did you hear anything else the driver of the Plymouth said at the scene of the collision?

"Mr. Banas: Object.

"The Court: Overruled.

"A. Yes. *He said he just didn't see him.* That was all."
(Emphasis added.)

Plaintiff also called Raymond White who lived right at the
curve close to the scene, did not see the accident, but heard
the crash, and went to the scene within a minute. He testified
as follows:

"Q. Upon arriving at the scene, would you tell the court
and jury in your own words what you observed? A. The two
cars had hit head-on there, and of course I saw a lady that
looked like she was pretty badly hurt laying on the floor.

"Q. This is a free hand drawing of South Market Avenue;
this is Kimball Road; north here and this to the south. Mr.
White, at that time, did you observe a bus? A. Yes.

"Q. Where was the bus in relation to Market Avenue,
South? A. It was right on the curve at a bus stop.

"Q. Was there a bus stop there? A. Yes.

"Q. Was the bus parked there at the time? A. It was.

"Q. This bus that you saw, do you have an idea how long it
was? A. I expect it would be pretty close to forty feet.
"* * *

"Q. Did you have a chance to observe the rear of the bus
in relation to the curb on South Market? A. It was setting on
the curb.

"Q. How far from the curb on South Market were the rear
wheels? A. I would say maybe three or four feet.

"Q. The rear wheels? A. No. The rear wheels could be
against the curb, but the front would be away from the curb.

"Q. How far were the front wheels from the curb? A. I
would say three to four feet.
"* * *

"Q. In relation to Market Avenue, South, could you tell the
court and jury what position this Plymouth and Studebaker
were in, in relation to the center of Market Avenue, South? A.
*Well, the Studebaker was over on his side of the road about as
far as he could go. The other car, I would say, was better than
the center.*

"Q. What do you mean by that? A. *If there had been
lines there, he would have been over the lines.*

"*Q. On which side. A. On the east side.*
"*Q. East of the center, is that what you say? A. Yes.*
"* * * *

"*Q. In relation to the center of Market Avenue, South, can you tell me where that debris was located? A. It would be more than the center to the east.*" (Emphasis added.)

Plaintiff also called another bus passenger, Jean Morrison, who, while getting off the bus rearmost or middle door, heard the crash and immediately went around the front of the bus and observed the position of the cars. She testified as follows:

"*Q. Mrs. Morrison, in regard to the southbound car, as you saw the southbound car in relation to the middle of Market Avenue, South, could you tell whether or not the southbound car was on the left side of Market Avenue—any of it?*

"Mr. Banas: Object.

"The Court: Objection overruled.

"*A. Yes, I would say so.*" (Emphasis added.)

The defendant and his wife naturally testified to the effect that he drove his car on his right lane and that plaintiff's car was crossed over the hypothetical center line when the collision occurred. The defendant also categorically denied the statements against interest attributed to him by plaintiff.

The defendant called two policemen, Richard Albert and Jack Serra, from the Canton City Traffic Bureau. Neither of them saw the accident. They arrived some 17 minutes after the accident and after the bus had gone. Both of them stated that Market Avenue, South, had a width of approximately 35 or 36 feet both north and south of this curve and that the street was marked by a white center line up to where the curve begins both ways, but was not so marked through the curve.

They saw the position of the cars and, from the debris, marked what *they thought* was the point of impact. They then took measurements and marked with yellow chalk upon the street where *they thought* the center line would be. They then removed the cars and took pictures. *Their* marked point of impact and *their* marked center line showed up on the pictures. They had the bus driver's name but made to effort to contact him.

The measurements they made to locate the point of impact

and its relation to the hypothetical center line took no account of the position, width or length of the stopped bus. Their measurements of the width of Market Avenue, South, through this curve and intersection were glaringly ridiculous. Their testimony was grossly incompetent, biased and opinionated. Defendant claims it was admitted without objection yet we find that Officer Albert stated:

"Q. Now, did you attempt to determine where the center of the road was? A. Yes, I did.

"Q. After you determined that, what did you do, if anything? A. After we determined where the center of the road was, first we made a mark while the cars were still together, and after we separated them.

"Q. What did you mark? A. *Where the center of the road would be.*

"Mr. Smart: *Move that the answer be stricken.*

"The Court: *Overruled.*

"A. After we had both cars pulled apart, we marked this with a yellow chalk mark.

"Q. Particularly calling your attention to this large white area between two skid marks here, I will ask you to tell this jury what that represents? A. *That mark there represents our observation what the center of the road is.*" (Emphasis added.)

We note that this testimony was the first time that either officer gave an opinion as to where the center of the road would be. In overruling plaintiff's motion to strike, the trial court committed error highly prejudicial to the plaintiff. This was a key ruling because it indicated that the trial court was going to allow such opinion evidence to stand, and plaintiff did not pursue his objections thereafter.

Officer Serra stated:

"A. No, sir, there were no markings whatsoever on the street.

"Q. Were there any markings close to the curve? A. Up Market Avenue there was a vague center line and we attempted to determine by two focus points looking north on Market and also in a southwesterly direction on Market, where these two would come together and along with that we measured the intersection at that point, which came to a total of *fifty-nine feet*

*where we measured,* and measured to the point of impact *which came to twenty-nine feet five inches, which we determined the accident occurred in the middle of the street.*

"Q. Showing you Plaintiff's Exhibit 'A,' I will ask you if, in your investigation of the accident, you made a mark on the street showing the hypothetical center of the road? A. That's right.

"Q. Point out to the jury where that mark is, if you can? A. That mark is right here.

"Q. Can you identify what these two marks are? A. This picture was marked north, showing that this was taken pointing north on Market Avenue, showing the skid marks coming south and also going north.

"Q. Can you determine from this photograph if there was any shakedown or debris? A. Yes, sir, right here.

"Q. Where is that located on the photograph? A. *On the southbound lane.*

"Q. Showing you what is marked as Plaintiff's Exhibit 'B' *would you mark* on that or can you show the jury *where the hypothetical center of the road was, where you determined it to be?* A. Yes, sir, *this yellow marking on here.*

"Q. Calling your attention to two tire marks extending from the north to the south, can you identify those? A. Yes, sir, this picture I took looking south on Market Avenue at the curve, and these skid marks are in the southbound lane.

"Q. Which vehicle do they belong to? A. They belong to the southbound 1957 Plymouth four door.

"Q. And that was driven by Mr. Louttit? A. Yes.

"Q. On there can you find any skid marks of any northbound car? A. Yes, sir. Here is showing one skid mark toward the center of the road of the northbound vehicle.

"Q. Calling your attention to that, *were you able to determine where the point of impact took place, in relation to the center of the road as you found it to be?* A. *It occurred to the west of that marking which would be in the southbound lane.*
"* * *

"Q. Could you see this vague white line to the north? A. *Vaguely.*

"Q. How far away? A. I have no idea.

"Q. Standing on the curve at Market Avenue, South, and looking to the south, could you see a white line to the south? A. If I recall correct, *yes, vaguely,* but the distance I don't recall.

"Q. Did you run a straight line by measurement or otherwise, from the white line you observed on Market Avenue, South, south of the curve to the north, at any point on the curve? A. We did not run a line in that manner; *we only used our eye.*

"Q. Did you use a line tape measure fastened, or any instrument, to extend the line you observed in Market Avenue, North—South, to the curve? A. *Just the eye.*

"Q. Then, Detective Serra, the hypothetical center that you have come up with on the curve in Market Avenue, South, you cannot say that is an exact center of Market Avenue, South, can you? A. *By measuring we determined the mark we have was the center of the road.*

"* * *

"Q. *How far from the west curb of Market Avenue, South, did the impact occur?* A. The exact measurements I do not know from the impact. *The pictures show it* here in comparison to our line *which was twenty-nine and a half feet from the curb. The pictures show and designate the point of center as twenty-nine and a half feet.*

"* * *

"Q. Who filled that out? A. I typed that out.

"Q. What does this say, Detective Serra? A. Collision.

"Q. Will you read that? A. Collision took place in the middle of the street, and position of the cars and then they were towed away, and street was measured *fifty-two feet wide. In the middle of the street we marked with yellow chalk* and we then took another picture of this as the dirt from the *impact was present and would show in the picture.*

"* * *

"Q. There has been a *variation of seven feet,* which you testified earlier to, as to the width, *does that variation* at all *disturb your find as to the center of the road,* as exhibited on Plaintiff's Exhibit 'A' and 'B'? A. *No, sir, not at all.*

"Q. In the conduct of your investigation, you were able to determine the center of the road and marked it with the

white area exhibited in Plaintiff's 'A' and 'B'? A. *The hypothetical center, yes sir.*'' (Emphasis added.)

When the testimony of the police officers is weighed and taken at face value, it is understood why the plaintiff used the pictures (plaintiff's exhibits ''A'' and ''B'') and why she did not pursue her objections to their testimony.

In the Traffic Code, Section 4511.01, Revised Code, ''Definitions,'' does not define center line. There is no Ohio case defining it or telling how a hypothetical center line is to be located on a curve.

There are few cases from other jurisdictions which do so. This is so perhaps because it has always been considered as a matter within the experience, knowledge and comprehension of an average layman or juror. It has been so stated with respect to the place of impact. See *Dickman* v. *Struble*, 104 Ohio App. 44, and *Roeder* v. *Fischer's Bakery, Inc.*, 118 Ohio App. 339. This latter case holds in the second paragraph of the syllabus:

''2. Where, in such case, an ultimate fact for determination by the trier thereof is the place of impact of the two colliding vehicles, it is error to permit a police officer, who did not see the collision, to give his opinion as to the place of such impact.''

The center line of a street means the geographical center line. See *Payne* v. *Vinecore*, 40 Wash. 2d 746, 246 P. 2d 448. It is always equidistant from the side lines. See *Maynard* v. *Weeks*, 41 Vt. 617. The center line remains constant and equidistant from the side lines through an intersected curve. See *Decker* v. *Roberts*, 126 Conn. 478, 12 A. 2d 541.

These two policemen admitted that Market Avenue, South, has a width of about 35 feet up to where the curve begins and ends, and that the line is marked and visible up to where the curve begins both north and south.

This curve is intersected by Kimball Road. There is a flare at the mouth of this intersection. However, this flare is in the width of Kimball Road and has nothing to do with and does not affect in any way the location of either the eastern edge, eastern curb line or the center line of Market Avenue, South, or the width of Market Avenue, South, as it rounds the curve.

The eastern edge or curb line of Market Avenue, South, is

a line drawn in a constant uniform arc, all points of which are equidistant from the plainly visible western curb.

The center line through the curve and intersection is determined by a line starting at one end on the visible-marked mid-point where the curve begins to the other visible-marked mid-point where the curve ends. This is a constant uniform arc, all points of which are equidistant from the westerly curb. The width of Market Avenue, South, as it rounds this curve would be a constant 35 feet, half of which would be 17½ feet.

It is apparent that the officers' measurements as to the width of Market Avenue, South, at this curve included a part of the flare of the Kimball Road intersection. It was first given as 59 feet and later corrected down to 52 feet, neither of which measurements could be correct.

*When the officers placed the distance of their point of impact at 26½ feet from the western curb,* such testimony shows to a mathematical certainty, as a matter of law, that the point of inpact was in plaintiff's right half of the street and that the defendant's car was wrongly over the center line into the plaintiff's lane of traffic.

The verdict and judgment here is not only against the manifest weight of the evidence but is also contrary to law.

Assignments of error Nos. 7 and 9 are sustained.

It is our determination that the defendant was guilty of negligence as a matter of law and that the defendant's negligence was the proximate cause of the accident as a matter of law. The judgment of the Common Pleas Court is reversed and the cause is remanded to the Common Pleas Court for the determination of damages. See *Kehrer* v. *McKittrick,* 176 Ohio St. 192.

*Judgment reversed.*

RUTHERFORD, P. J., and VAN NOSTRAM, J., concur.